UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

OCT - 7 2015

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. SI-4:15 CR 122 AGF |
| | ) |
| JENNIFER ANN KOLAWOLE, | ) |
| | ) |
| Defendant. | ) |

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

1.      At all times relevant to this indictment, Jennifer Ann Kolawole was a resident of Manchester, Missouri, in St. Louis County.  From in or about August 2008 to in or about 2013, the defendant was employed at Baby Boomers Health, LLC, doing business as A Better Way Home Care (referred to hereafter as Better Way).  In or about 2009, the defendant became the assistant administrator of Better Way and reported directly to unindicted co-conspirator T.K., the owner, president, and administrator of Better Way (referred to hereafter as co-conspirator T.K).

### State Licensing and Monitoring of Home Health Care Agencies

2.      A home health care agency must be licensed by the state in which the agency provides services.  In Missouri, the Department of Health & Senior Services (DHSS) is responsible for the initial certification and licensure of home health care agencies and for monitoring the agencies thereafter.  DHSS works in conjunction with the Centers for Medicare and Medicaid Services to ensure that the home health care agencies comply with state and federal regulations governing home health care agencies.

3. After an initial inspection, DHSS approved Better Way's application for a state license on or about December 6, 2005.

## Medicare Provider Enrollment & Participation

4. The Medicare Program is a federal health benefits program, primarily for the elderly and disabled. Medicare reimburses enrolled health care providers for covered health services that are provided to eligible Medicare beneficiaries. The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program. CMS acts through fiscal agents called Medicare Administrative Contractors (MACs), which are statutory agents for CMS.

5. To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

6. As part of the application process, co-conspirator T.K., on behalf of Better Way, signed a CMS-855A form that informed her of the penalties for falsifying information to gain or maintain enrollment in the Medicare program, as well as the penalties for falsifying information when seeking reimbursement from the Medicare program. The following notice was included:

> U.S.C. 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willingly falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry.

7.     The Medicare provider enrollment application further states, under Section 15, Certification Statement, items #7 and #8:

> I understand that the Medicare billing number issued to me can only be used by me or by a provider or supplier to whom I have reassigned my benefits under current Medicare regulations, when billing for services rendered by me. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

8.     In 2005, 2006, and again in 2012, co-conspirator T.K., in her capacity as president and vice-president of Better Way, signed CMS Form 855 (Section 15), which states: "I have read the contents of this application. My signature legally and financially binds this provider to the laws, regulations and program instructions of the Medicare program."

9.     After successful completion of the application process, the MAC assigned Better Way a unique provider number, which Better Way thereafter used to bill Medicare.

10.     Medicare providers must retain clinical records for the period of time required by state law or five years from date of discharge if there is no requirement in state law.

## Medicare Reimbursement for Home Health Care

11.     As stated above, the MACs are private entities that act as fiscal agents for CMS. The MACs review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic area, including determining whether the claim is for a covered service. During the relevant time period, CGS Administrators LLC (CGS) was the Home Health and Hospice MAC for Eastern Missouri and thus processed Better Way's claims for Medicare reimbursement.

12.      Medicare typically pays home health agencies for 60 day episodes of care. Medicare makes two payments to the home health care agencies, the first before the service is provided and a second payment at the end of the 60 day episode of care. To obtain the initial partial payment, a health care agency must submit a Request for Anticipated Payment (RAP), which is based on the anticipated services to be provided to a particular patient. Medicare then pays the home health care agency 60% of the total amount that Medicare will pay for services to the patient.

13.      The second and final payment for the episode of care is based on the actual number of services provided to the patient. This payment may be more or less than 40% of the amount originally calculated for the 60 day episode of care. The home health care agency will be paid less than 40% if the agency did not provide the number of visits listed on the Outcome and Assessment Information Set (OASIS) form.

14.      Medicare will reimburse for home health care services only if the patient needed the services. A prospective patient may contact a home care agency directly or may be referred by a health care professional. In all instances, the home health care agency must determine if the patient needs the services and the type and frequency of the services. The OASIS is a detailed, patient specific, data collection form, which is used to document the patient's health status and the patient's need for home health. The patient's condition, clinical severity, functional status, and care and therapy needs are documented on the OASIS form.

15.      The home health care agency then inputs the information from the OASIS form into the Havens software, which generates a health insurance prospective payment system (HIPPS) code. The HIPPS code determines the reimbursement rate and is placed on the reimbursement claim submitted to Medicare.

16.     Medicare considers a number of factors in determining the reimbursement rate for home health care services:  the patient's medical diagnoses, functional limitations, and the number and type of services the patient needs.  The higher the number of services and the anticipated cost to provide the services, the more Medicare pays for the care of a patient.

17.     Home health care agencies typically submit reimbursement claims electronically. Better Way chose to submit its claims electronically and to receive payments by electronic funds transfer or direct deposit.

### Description of Better Way

18.     Better Way hired nurses and contracted with therapists to assess and evaluate patients and to determine the patients' need for skilled nursing care and various therapies. Neither the defendant nor co-conspirator T.K. had any medical or health care education, training, or experience, which would qualify them to assess or evaluate patients or determine their care needs.  Prior to working at Better Way, both had worked in non-health related fields.

19.     Better Way was required to employ or contract with professional nursing staff, who were responsible for insuring that patient assessments were properly conducted, the OASIS forms were correctly completed, and the prescribed services were provided.  The OASIS form included a section where the nurse or therapist listed the number of skilled nursing or therapy visits that they anticipated the patient would need during the 60 day episode of care.

20.     Medicare required Better Way to document the number of therapy visits in writing and this information was included in the patient's medical record.  At the end of the 60 day episode of care, Better Way staff reviewed the medical record and counted the actual nursing and therapy visits documented in the patient medical record.  The date and type of visits were then recorded on a form called a billing work sheet.

5

21.     Better Way contracted with an outside biller to submit reimbursement claims to Medicare. Billing work sheets were faxed to the biller; on some occasions the biller received the billing work sheets directly from co-conspirator T.K. After submitting the claims, the biller returned the worksheets and related claims to Better Way.

### COUNT 1
### THE CONSPIRACY AND ITS OBJECTS
### 18 U.S.C. § 371

22.     Paragraphs 1 to 21 are incorporated by reference as if fully set out herein.

23.     From in or about 2011 and continuing to in or about 2013, with the exact dates unknown, in the Eastern District of Missouri and elsewhere, Jennifer Kolawole, the defendant herein, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together, and with each other, to commit offenses against the United States and to defraud the United States, that is,

a.     to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, in connection with the delivery and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347;

b.     to knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device a material fact; make materially false, fictitious, and fraudulent statements, and representations; and make and use a materially false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1035;

c.     to knowingly and willfully falsify, conceal, and cover up by any trick, scheme, and device a material fact; make materially false, fictitious, and fraudulent statements and

representations; and make and use a materially false writing and document knowing

the same to contain a materially false, fictitious, and fraudulent statement and entry,

in any matter within the jurisdiction of the executive branch of the Government of the

United States, in violation of 18 U.S.C. §1001; and

d.  to willfully prevent, obstruct, mislead, and delay and to attempt to prevent, obstruct,

mislead, and delay the communication of information and records relating to a

violation of a federal health care offense to a criminal investigator, in violation of 18

U.S.C. § 1518.

### PURPOSE OF THE CONSPIRACY

24.     The purpose of the conspiracy was for the defendant and the other

co-conspirators:

a.  to obtain reimbursement for health care services which Better Way knew were

medically unnecessary, up-coded, or not provided;

b.  to create and use documents and writings and to make false, fictitious, and fraudulent

statements and representations to conceal and cover up the health care fraud scheme;

and

c.  to provide the proceeds of the fraud scheme to the defendant and co-conspirator T.K.

### MANNER AND MEANS OF THE CONSPIRACY

25.     It was part of the conspiracy that Better Way and its employees falsified OASIS

forms and billing work sheets.

26.     It was further part of the conspiracy that Better Way and its employees submitted

false reimbursement claims to health care benefit plans.

7

27.     It was further part of the conspiracy that Better Way and its employees concealed and covered up the fraud scheme by false and fraudulent statements, representations, and documents.

## OVERT ACTS

28.     In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri.

### Falsification of the OASIS Forms

29.     Registered nurse D.L. worked at Better Way during 2009 and 2010 and was the director of nursing during his or her employment there.  Co-conspirator T.K. directed D.L. to increase the number of therapy visits on the OASIS form, although co-conspirator T.K. knew the patients did not need the therapy.

30.     Registered nurse S.D. worked for Better Way for about 3 months in 2011.  Co-conspirator T.K. directed S.D. to increase the number of therapy visits to 13.  Co-conspirator T.S directed S.D. to change the patients' ADL (activities of daily living) score on the OASIS.  The ADL refers to the patients' ability to walk, transfer between a bed and a chair, bathe, use the toilet, etc.

31.     During 2011, co-conspirator T.K. directed J.N., the director of nursing at the time, to indicate on the OASIS forms that patients needed more therapy visits than they actually needed.

32.     Registered nurse J.F. worked at Better Way from in or about November 2011 to March 2012.  J.F. confronted the defendant when the defendant directed another Better Way employee to put 20 therapy visits on the OASIS forms to increase Medicare reimbursement. The

defendant stated that she would talk to co-conspirator T.K. and further responded that that was the way "we" always did it.

33.     Registered nurse J.F. was responsible for selecting diagnosis codes, which accurately reflected the patients' condition and the reason the patients were receiving home health care services from Better Way.  Co-conspirator T.K. directed J.F. to list as the primary diagnosis the one that would result in a larger payment to Better Way.

34.     Employee D.D. worked for Better Way for about three years and left in 2012. Co-conspirator T.K. directed D.D. to enter into the computer a greater number of visits than the nurse or therapist had listed on the OASIS forms.  In some instances, co-conspirator T.K. directed D.D. to increase the number of visits to 20, which was more than twice what the nurse or therapist had listed on the OASIS form

<strong><u>Falsification of Billing Worksheets</u></strong>

35.     Employee A.M. worked from June 2010 to February 2012 for Better Way and at times was responsible for preparing the billing work sheets.  Co-conspirator T.K. directed A.M. to indicate that the therapy visits lasted longer than reflected in the patient medical records.

36.     When some employees refused to increase the number of therapy visits, co-conspirator T.K. personally increased the number of visits.  In some instances the patient had received no therapy at all.

37.     The defendant prepared and assisted in the preparation of billing work sheets that falsely stated the patients had received more therapy visits than they had actually received.

<strong><u>Other False Statements and Documents</u></strong>

38.     Employee T.G. worked for Better Way as a home health aide from in or about 2009 to in or about October 2012. One of her duties was to give showers to patients who needed

9

this assistance. In or about June 2012, the defendant asked T.G. to sign a form indicating that she provided the service when T.G. and the defendant knew she had not provided the service. T.G. signed the statement, falsely indicating she had provided the service, because the defendant was her boss.

39.    Registered nurse E.P. worked for Better Way in or about 2011 and 2012. The defendant asked E.P. to write a note indicating that a patient refused a bath, although the defendant knew the patient had not refused a bath. E.P. refused to write the note.

40.    Employee E.P. told the defendant that patient R.M. did not need to be seen anymore. The defendant insisted that E.P. continue to see the patient for five more visits because "that's what they needed for Medicare."

<u>**Submission of False Reimbursement Claims**</u>

41.    Co-conspirator T.K. told the Better Way biller that she had found therapy visits which had not been billed. Co-conspirator T.K. directed the biller to submit claims for the "found" therapy visits, when co-conspirator T.K. knew the patients had not received therapy.

42.    The defendant and co-conspirator T.K. submitted and caused to be submitted reimbursement claims to Medicare for services which they knew had not been provided. In numerous instances, neither the patient medical record at Better Way nor the records of the therapy company document any service on the dates listed on the false reimbursement claims. Examples of these false claims are listed below:

| | Patient | Care Dates | Number of Therapy Visits Billed | Number of Therapy Visits Provided |
|---|---|---|---|---|
| a. | B.E. | 4/29/11 to 06/27/11 | 18 | 1 |
| b. | A.F. | 3/09/11 to 04/04/12 | 56 | 1 |
| c. | A.G. | 8/23/11 to 10/21/11 | 21 | 0 |

10

| | | | | |
|---|---|---|---|---|
| d. | C.G. | 8/29/11 to 01/27/12 | 37 | 7 |
| e. | D.G. | 5/04/11 to 06/29/11 | 23 | 0 |
| f. | L.G. | 6/08/11 to 08/06/11 | 21 | 0 |
| g. | R.G. | 6/08/11 to 10/04/11 | 33 | 6 |
| h. | M.H. | 11/08/11 to 03/08/12 | 16 | 0 |
| i. | R.H. | 12/22/10 to 02/18/11 | 22 | 1 |
| j. | M.J. | 5/06/11 to 07/04/11 | 21 | 0 |
| k. | M.L. | 7/05/11 to 11/01/11 | 36 | 0 |
| l. | J.M. | 7/22/11 to 09/19/11 | 13 | 1 |
| m. | N.S. | 6/09/11 to 07/30/11 | 23 | 0 |
| n. | C.V. | 12/01/11 to 03/29/12 | 37 | 2 |
| o. | D.W. | 8/19/11 to 02/14/12 | 42 | 3 |

All in violation of Title 18, United States Code, Section 371.

## COUNT 2-3
### False Statements Involving
### Health Care Benefit Plan
### Title 18, United States Code, Section 1035(a)(1) and Section 2

43. Paragraphs 1 to 42 are incorporated by reference as if fully set out herein.

44. On or about the dates indicated below, in the Eastern District of Missouri,

### JENNIFER ANN KOLAWOLE

the defendant herein and co-conspirator T.K., in a matter involving a health care benefit program, knowingly and willfully made and used, and caused to be made and used, materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries in connection with the delivery of and payment for health care benefits, items, and services, in that the defendant represented on billing work sheets and claim

11

forms that patients had received therapy services when the defendants knew that the patients had not received the therapy.

| Count | Patient | Dates of Service | Number of Therapy Visits Billed | Number of Therapy Visits Provided | Final Claim Date |
|-------|---------|------------------|----------------------------------|------------------------------------|-------------------|
| 2 | A.G. | 08/23/11 to 10/21/11 | 21 | 0 | 01/18/12 |
| 3 | L.G. | 06/08/11 to 08/06/11 | 21 | 0 | 11/18/11 |

All in violation of Title 18, United States Code, Section 1035(a)(1) and Section 2.

## COUNT 4
### False Statements To Federal Agency
### Title 18, United States Code, Section 1001(a)(2) and Section 2

45.     Paragraphs 1- 42 are incorporated by reference as if fully set out herein.

46.     Special Agent Linda Hanley is a federal agent of the U.S. Department of Health and Human Services, Office of the Inspector General, Office of Investigations (HHS/OIG), which is responsible for investigating allegations of fraud in the Medicare Program.  Special Agent Hanley was one of the federal agents investigating allegations that Better Way was submitting fraudulent claims to Medicare.

**May 1, 2012 Interview**

47.     On or about May 1, 2012, HHS/OIG Special Agent Linda Hanley interviewed the defendant at the Better Way offices.  The defendant denied having any knowledge of the OASIS form, which Better Way was required to use to assess and report a patient's condition and need for therapy and other services.  The defendant knew that this statement was false when she made it. The defendant had been the assistant administrator for Better Way for about three years and, according to Better Way employees, was very familiar with the OASIS form and other Medicare requirements. .

12

**August 30, 2012 Interview**

48.     On or about August 30, 2012, HHS/OIG Special Agent Hanley and FBI Special Agent Brooke Gaynor interviewed the defendant during the execution of a search warrant at Better Way. The defendant falsely stated that she was not involved at all in Medicare billing, did not fill out billing work sheets, and had never seen co-conspirator T.K. fill out billing work sheets. The defendant knew these statements were false because the defendant and co-conspirator T.K. completed billing work sheets on many occasions.

**October 24, 2012 Interviews**

49.     On or about October 24, 2012, HHS/OIG Special Agent Hanley and HHS/OIG Special Agent Bill Young interviewed the defendant at the United States Attorney's Office. The defendant once again falsely stated that she had never completed billing work sheets and was not involved in any way with billing.

50.     On or about October 24, 2012, Special Agent Hanley interviewed co-conspirator T.K. and asked her about the fraud allegations against her and Better Way. Co-conspirator T.K. falsely stated that she did not have anything to do with billing for Better Way services, did not know how the numbers got on the work sheets, and did not know the meaning of the numbers on the worksheets

**November 20, 2012 Interview**

51.     On or about November 20, 2012, HHS/OIG Special Agent Hanley and FBI Special Agent Brooke Gaynor interviewed the defendant at her home. She falsely stated that she had nothing to do with billing.

**December 18, 2012 Interview**

52.     On or about December 18, 2012, HHS/OIG Special Agent Hanley and HHS/OIG Special Agent Stacey Jordan interviewed the defendant at a public library located in Manchester, Missouri.  During the interview, the defendant was informed that a Better Way employee had stated that the defendant was involved in the billing process and completed billing work sheets. The defendant still insisted that her only responsibility was to check on the filing, calculating, and faxing of the work sheets to the outside biller and nothing else.

53.     The defendant was then shown billing work sheets with her handwriting on the sheets.  Only when faced with the documents did the defendant finally admit that she had completed billing work sheets.  However, the defendant still attempted to minimize her actions by stating that she had only completed a few billing work sheets.

54.     On or about August 30, 2012, in the Eastern District of Missouri,

**JENNIFER ANN KOLAWOLE,**

the defendant herein, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to HHS/OIG Special Agent Hanley and FBI Special Agent Brooke Gaynor, concerning a matter within the jurisdiction of the executive branch of the Government of the United States.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

**COUNT 5**
**Obstruction of Criminal Health Care Investigation**
**Title 18, United States Code, Section 1518(a)(2) and Section 2**

55.     Paragraphs 1- 42 and 46-53 are incorporated by reference as if fully set out herein.

56.     On  or about October 24, 2012, in the Eastern District of Missouri,

**JENNIFER ANN KOLAWOLE,**

the defendant herein, did willfully prevent, obstruct, mislead, and delay the communication of

information and records relating to a violation of a federal health care offense to a criminal

investigator.

All in violation of Title 18, United States Code, Sections 1518 and 2.

## FORFEITURE ALLEGATIONS

The Grand jury further finds by probable cause that:

1.     Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of

an offense in violation of Title 18, United States Code, Sections 371, 1035(a)(1), 1001(a)(2) and

1518(a)(2), as set forth in Counts 1 through 5, the defendants shall forfeit to the United States of

America any property, real or personal, that constitutes or is derived, directly or indirectly, from

gross proceeds traceable to the commission of the offenses.

2.     Subject to forfeiture is a sum of money equal to the total value of any property,

real or personal, constituting or derived from any proceeds traceable to said offenses.

3.     If any of the property described above, as a result of any act or omission of the

defendants:

       a.     cannot be located upon the exercise of due diligence;

       b.     has been transferred or sold to, or deposited with, a third party;

       c.     has been placed beyond the jurisdiction of the court;

       d.     has been substantially diminished in value; or

       e.     has been commingled with other property which cannot be divided

       without difficulty,

15

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

A TRUE BILL.


_____

FOREPERSON

RICHARD G. CALLAHAN
United States Attorney


_____

DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney